**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>                     Reorganized Debtors. | |
| CELSIUS NETWORK LLC and affiliated post-Effective Date Debtors, by and through the Blockchain Recovery Investment Consortium LLC, acting in its capacity as the Complex Asset Recovery Manager and Litigation Administrator,<br><br>               Plaintiff,<br><br>           -against-<br><br>CHAINALYSIS, INC.,<br><br>              Defendant. | Civil No. 1:25-cv-02669-MMG |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW**

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ 3

PRELIMINARY STATEMENT .................................................................................... 7

FACTS ALLEGED IN THE COMPLAINT .................................................................. 8

APPLICABLE STANDARD ON MOTION TO DISMISS............................................ 10

ARGUMENT ................................................................................................................ 11

    **I.**   **THE *IN PARI DELICTO* DOCTRINE DOES NOT BAR PLAINTIFF'S AIDING AND ABETTING CLAIM** ............................................................................. 12

        **A.**   **The Adverse Interest Exception Squarely Applies.** ................................. 13

        **B.**   **Chainalysis's *In Pari Delicto* Argument Is Premature, at Best.** ........... 16

        **C.**   **Equitable Considerations Bar Application of *In Pari Delicto.*** ................ 17

    **II.**  **THE COMPLAINT ADEQUATELY ALLEGES THAT CHAINALYSIS HAD ACTUAL KNOWLEDGE AND ACTIVELY PARTICIPATED** ............................. 18

    **III.** **THE STATE CONSUMER CLAIMS ARE SUFFICIENTLY PLED**...................... 23

        **A.**   **The Complaint Sufficiently Pleads Causation and Reliance by the Contributed Claimants.** ................................................................................................ 24

        **B.**   **Chainalysis Improperly Goes Beyond the Four Corners of the Complaint and Attempts to Litigate the Facts Through Its Motion to Dismiss.** ............ 25

        **C.**   **Count 12 Is Properly Brought by Plaintiff.** ............................................. 27

        **D.**   **The State Consumer Protection Claims Are Not Time-Barred**................ 28

            1.  *Accrual Under the Discovery Doctrine is a Question of Fact Not Suitable to Determination on a Motion to Dismiss (Counts 8 and 16)* ......................... 28

            2.  *Chainalysis Incorrectly Asserts the Date the Injury Occurred Under New York Law (Counts 2 and 3)* ............................................................................. 29

        **D.**   **The State Consumer Protection Claims Sufficiently Allege a Nexus to the Respective States (Counts 5, 14, And 16).** ............................................. 29

        **E.**   **Chainalysis's Claims of Deficient Pre-Suit Notice Fail (Counts 8 And 14).** ........ 31

CONCLUSION............................................................................................................... 32

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alaface v. Nat'l Inv. Co.*,
  892 P.2d 1375 (Ariz. Ct. App. 1994)...................................................................... 27

*Allstate Ins. Co. v. A & F Med. P.C.*,
  2017 WL 4350418 (E.D.N.Y. Apr. 24, 2017) ...................................................... 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 10

*Aspinall v. Philip Morris Companies, Inc.*,
  442 Mass. 381, 813 N.E.2d 476 (2004)............................................................... 23

*Bano v. Union Carbide Corp.*,
  361 F.3d 696 (2d Cir. 2004) ................................................................................ 28

*Brooks v. Tarsadia Hotels*,
  2019 WL 6611506 (S.D. Cal. Dec. 5, 2019) ...................................................... 27

*Buckley v. Deloitte & Touche USA LLP*,
  2007 WL 1491403 (S.D.N.Y. May 22, 2007) .......................................... 14, 16, 17

*Bullmore v. Ernst & Young Cayman Islands*,
  20 Misc.3d 667 (Sup. Ct. N.Y. Cty. 2008) ........................................................ 15

*Callen v. Resonant Inc.*,
  709 F. Supp. 3d 1021 (C.D. Cal. 2023) .......................................................... 10, 25

*Cheatham v. ADT Corp.*,
  161 F. Supp. 3d 815 (D. Ariz. 2016) ................................................................. 27

*Childs v. Haussecker*,
  974 S.W.2d 31 (Tex. 1998) ................................................................................ 27

*Chimienti v. Wendy's Int'l, LLC*,
  698 F. Supp 3d 549 (E.D.N.Y. 2023) ................................................................ 23

*Conway v. Marcum & Kliegman LLP*,
  176 A.D.3d 477 (1st Dep't 2019) .................................................................. 14, 16

*Cosmas v. Hassett*,
  886 F.2d 8 (2d Cir. 1989) .................................................................................. 25

*Coulter v. Grant Thornton, LLP*,
  388 P.3d 834 (Ariz. Ct. App. 2017).................................................................... 27

*Dalton v. Countrywide Home Loans, Inc.*,
  828 F. Supp. 2d 1242 (D. Colo. 2011) ............................................................... 27

*Dalziel Dalzeal LLC v. Mellberg*,
  2024 WL 470363 (11th Cir. 2024) .................................................................... 10

*Dejesus v. HF Mgmt. Services, LLC*,
   2012 WL 5289571 (E.D.N.Y. Oct. 23, 2012) ............................................................ 25

*DeLuca v. AccessIT Grp., Inc.*,
   695 F. Supp. 2d 54 (S.D.N.Y. 2010) .............................................................. 10, 25

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
   479 F. Supp. 2d 349 (S.D.N.Y. 2007) ...................................................... 21, 22, 24

*Gaidon v. Guardian Life Ins. Co. of Am.*,
   96 N.Y.2d 201 (2001) ............................................................................................. 28

*Gatt Communications, Inc. v. PMC Associates, LLC*,
   711 F.3d 68 (2d Cir. 2013) ..................................................................................... 15

*Gibbons v. Malone*,
   703 F.3d 595 (2d Cir. 2013) ................................................................................... 10

*Glob. Crossing Est. Rep. v. Winnick*,
   2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) ........................................................... 16

*Gomez-Jimenez v. New York Law Sch.*,
   36 Misc. 3d 230, 943 N.Y.S.2d 834 (Sup. Ct. 2012) ....................................... 23, 24

*Gundel v. AV Homes, Inc.*,
   290 So. 3d 1080 (Fla. 2d DCA 2020) ..................................................................... 23

*Hall v. Walter*,
   969 P.2d 224 (Colo. 1998) ...................................................................................... 23

*In re Adelphia Communications Corp.*,
   330 B.R. 364 (Bankr. S.D.N.Y. 2005) .............................................................. 12, 14

*In re BC Funding, LLC*,
   519 B.R. 394 (Bankr. E.D.N.Y. 2014) ................................................................... 12

*In re FTX Cryptocurrency Exch. Collapse Litig.*,
   2025 WL 1341173 (S.D. Fla. May 7, 2025) ............................................................ 21

*In re Hellas Telecomm. (Luxembourg) II SCA*,
   524 B.R. 488 (Bankr. S.D.N.Y. 2015) .................................................................... 16

*In re Ideal Mortgage Bankers, Ltd*,
   539 B.R. 213 (Bankr. E.D.N.Y. 2015) ................................................................... 20

*In re Parmalat Sec. Litig.*,
   383 F. Supp. 2d ....................................................................................................... 14

*In re Personal & Bus. Ins. Agency*,
   334 F.3d 239 (3d Cir. 2003) ................................................................................... 17

*Keiler v. Harlequin Enter. Ltd.*,
   751 F.3d 64 (2d Cir. 2014) ..................................................................................... 10

*Kirschner v. KPMG LLP*,
   15 N.Y.3d 446 (2010) ................................................................................. 12, 13, 14

*Koch v. Royal Wine Merchants, Ltd.*,
   847 F. Supp. 2d 1370 (S.D. Fla. 2012) .................................................................. 29

*Krys v. Butt*,
  486 Fed. Appx. 153 (2d Cir. 2012)..........................................................................21
*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
  438 Mass. 459, 781 N.E.2d 787 (2003) ..................................................................29
*Lerner v. Fleet Bank*,
  459 F.3d 273 (2d Cir. 2006) ............................................................................20, 21
*Meinhard v. Salmon*,
  164 N.E. 545 (1928) ...............................................................................................20
*Morgan v. AT&T Wireless Services, Inc.*,
  99 Cal. Rptr. 3d 768 (Ct. App. 2009) .....................................................................30
*Oh v. Catalina Snacks, Inc.*,
  764 F. Supp. 3d 903 (C.D. Cal. 2025) .....................................................................25
*Pani v. Empire Blue Cross Blue Shield*,
  152 F.3d 67 (2d Cir. 1998) ......................................................................................25
*Pearl v. Coinbase Global Inc.*,
  2024 WL 3416505 (N.D. Cal. 2024) ........................................................................31
*Pearson v. Gesner*,
  125 F.4th 400 (2d Cir. 2025) ...................................................................................26
*Republic of Iraq v. ABB AG*,
  768 F.3d 145 (2d Cir. 2014) ....................................................................................15
*Robinson v. Giarmarco & Bill, P.C.*,
  74 F.3d 253 (11th Cir. 1996) ...................................................................................29
*RocketFuel Blockchain Co. v. Ellenoff Grossman & Schole LLP*
  2022 WL 80482 (S.D.N.Y. Jan. 7, 2022) ................................................................14
*Rushing v. Williams-Sonoma, Inc.*,
  2022 WL 2833980 (N.D. Cal. July 20, 2022) ..........................................................27
*Scott v. Westchester Cnty.*,
  434 F. Supp. 3d 188 (S.D.N.Y. 2020) ..............................................................10, 25
*Shearson Lehman Hutton, Inc. v. Wagoner*,
  944 F.2d 114 (2d Cir.1991) .....................................................................................12
*State ex rel. Corbin v. Goodrich*,
  151 Ariz. 118 (App. 1986).......................................................................................29
*Talipot ESG Invs. LLC v. Bulltick Fin. Advisory Servs. LLC*,
  85 Misc. 3d 1234(A), 2025 N.Y. Slip Op. 50349(U) (Sup. Ct., N.Y. Cnty. 2025).................21
*Van Woudenberg v. Gibson*,
  211 F.3d 560 (10th Cir. 2000) .................................................................................25
*Vanguard Specialized Funds v. VEREIT Inc.*,
  2016 WL 5858735 (D. Ariz. Oct. 3, 2016)..............................................................29
*Williams v. Time Warner Inc.*,
  440 F. App'x 7 (2d Cir. 2011)..................................................................................10

*York v. Sullivan*,
    369 Mass. 157, 338 N.E.2d 341 (1975) ............................................................ 30, 31
*Young v. Toyota Motor Sales, U.S.A.*,
    196 Wash. 2d 310, 472 P.3d 990 (2020) ............................................................ 23

**<u>Statutes</u>**

Cal. Civ. Code §1750 ............................................................................................ 31
Colo. Rev. Stat. § 6-1-10 ...................................................................................... 27
Colo. Rev. Stat. § 6-1-113(1)(b) .......................................................................... 26

Celsius Network LLC, and affiliated post-Effective Date Debtors,[2] ("Celsius," the "Company," or "Plaintiff"), by and through the Blockchain Recovery Investment Consortium, LLC ("BRIC"), acting in its capacity as the Complex Asset Recovery Manager and Litigation Administrator, hereby files its response in opposition to the Motion to Dismiss [ECF No. 24] filed by defendant Chainalysis, Inc. ("Chainalysis" or "Defendant"), and states as follows:

## PRELIMINARY STATEMENT

Chainalysis asks this Court to disregard well-pled, specific allegations of knowing misconduct. Its arguments are based on a manufactured narrative that contradicts the Complaint and misapplies the governing legal standards. But at this stage, Plaintiff's allegations must be accepted as true. And those allegations are damning: Chainalysis, a self-described blockchain analytics authority, knowingly lent its name, credibility, and public endorsement to a false press release that misrepresented Celsius's financial health and misled the company and consumers.

This was not a case of inaction, oversight, or innocent error. The Complaint alleges that Chainalysis had access to Celsius's underlying data, knew the "audit" never happened, knew the reported figures were false, and still approved and promoted them as independently verified. It did so to advance its own interests—boosting its reputation and credibility in a rapidly expanding market. The law does not shield this kind of conduct.

Chainalysis's motion relies on distortions of the Complaint, improper factual disputes, and procedural technicalities that cannot support dismissal. The motion also fails to grapple with well-established precedent rejecting the *in pari delicto* defense at the pleading stage where, as here, the facts show the plaintiff was a victim of insider looting. Nor can dismissal be justified on statute of

---

[2] This Court appointed BRIC as Complex Asset Recovery Manager and Litigation Administrator pursuant to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Dkt. No. 4289] (the "Plan").

limitations grounds, as the Complaint plausibly alleges timely injuries and the applicability of the discovery rule—both of which raise factual questions inappropriate for resolution at this stage. The Complaint more than satisfies the applicable standards for aiding and abetting, consumer protection, and other claims. Chainalysis's motion should be denied.

## FACTS ALLEGED IN THE COMPLAINT

Celsius, founded in 2017, operated a cryptocurrency platform offering interest-bearing accounts and low-interest loans secured by digital assets. (Compl. ¶¶ 2, 23–24.) Central to its business model was the CEL token, which Celsius issued and promoted as a means to receive enhanced benefits under its programs. (*Id.* ¶¶ 25–30.) Celsius's executive team and select employees initially owned 123.5 million CEL (19% of the ICO). (*Id.* at ¶31.) Abandoning the interests of the Company, select Celsius insiders ("Insiders") sought to artificially drive up the demand for CEL. (*Id.* at ¶33.) The higher the price of CEL, the more money the Insiders could make by selling their own CEL, which held no inherent value. (*Id.* at ¶35.) This artificial inflation allowed the Insiders, who knew the CEL market price represented a false value, to rake in false profits to the detriment of those purchasing the overpriced CEL, including innocent customers and the Company itself, which was being forced to continue to purchase CEL on the market to keep up with the artificial demand. (*Id.*)

As of October 2020, Celsius had been operating for over two years, but it had never publicized an audit of its AUM—a critical metric for customers and others deciding whether to deposit assets with Celsius. To drive demand for CEL tokens and customer deposits the Insiders decided to lie about Celsius's AUM. (*Id.* at ¶33.) To execute this scheme, the Insiders enlisted the assistance of Defendant Chainalysis, a blockchain analysis company that markets itself as a trusted

authority in cryptocurrency. (*Id*. ¶¶ 1, 3–6, 36–40.) Chainalysis proceeded to work closely with the Insiders to publicize a massive—and fraudulent—AUM figure. (*Id*. at ¶40.)

After calculating its actual AUM at approximately $1.2 billion using Chainalysis's Reactor software in November 2020, the Insiders revised the methodology to add the value of CEL tokens it held internally to inflate the AUM to over $3.3 billion. (*Id*. ¶¶ 41, 43–46.) Chainalysis reviewed and approved the revised methodology and the underlying data used to recalculate the fraudulent AUM. (*Id.* at ¶50.) Chainalysis agreed to provide legitimacy to this inflated AUM figure. (*Id*. ¶¶ 3–4, 36–37, 47.)

On December 9, 2020, Celsius and Chainalysis jointly issued a press release falsely claiming that Chainalysis had conducted an audit confirming Celsius held $3.31 billion in AUM (the "Press Release"). (*Id*. ¶¶ 4, 48, Ex. A.) The Press Release, announced "the completion of *an audit confirming $3,318,368,196.40 of assets by Chainalysis*."  According to the Press Release, the audit was "*based on transactions, total deposits and total withdrawals* since launch of the service in June 2018."  The Press Release boasted that the "*[t]hird-party analysis* provides transparency with *independent verification* and *proof of funds* at the industry-leading cryptocurrency rewards and lending platform." (*Id*. at ¶48.) This Press Release was the first time that it was publicly represented that Celsius' AUM had been validated by a third party. (*Id*. ¶ 52.)

Before publishing, Chainalysis reviewed and edited the Press Release, approved its final form, and even offered its own quotes about Chainalysis having "verified the process and accuracy" of Celsius's AUM. (Compl. ¶¶ 49, 51.) Chainalysis' Chief Revenue Officer, Jason Bonds, was quoted in the Press Release describing a two year-long relationship of "working together" with Celsius and "deploying [Chainalysis's] transaction monitoring software" before being asked "to help provide further transparency to [crypto] community by verifying the process

*and accuracy* of the information related to the net funds collected by Celsius." (*Id*. at ¶49.) Bonds described the audit process as "accounting for over $7,609B in deposits and [$]4.290B in withdrawals since Celsius launched its service in June of 2018." (*Id*.) In reality, the AUM figure was based on a manipulated methodology that included CEL tokens and did not reflect net deposits and withdrawals, as claimed. (*Id*. ¶¶ 45–46, 50, 54–56.) Chainalysis knew that the statements in the Press Release were false, including the claim that Chainalysis conducted an audit and independent verification of the AUM. (*Id*. at ¶¶ 54, 57.)

Chainalysis's backing gave the false AUM figure credibility. As alleged, this misrepresentation caused a surge in customer deposits, elevated the price of CEL tokens, and enabled Insiders to sell their personal CEL holdings to Celsius and customers at inflated prices for personal gain. (*Id*. ¶¶ 7, 53, 61–72.) Celsius ultimately collapsed under the weight of its liabilities and filed for Chapter 11 bankruptcy in July 2022. (*Id*. ¶¶ 9, 73–75.)

## APPLICABLE STANDARD ON MOTION TO DISMISS

When assessing a Rule 12(b)(6) motion, the Court must accept all factual allegations as true and draw all reasonable inferences in the light most favorable to the plaintiff. *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013) Assuming the truthfulness of "well-pleaded factual allegations," the Court must determine "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A complaint does not need to contain detailed or elaborate factual allegations but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enter. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014).

The Court is limited to the four corners of the complaint but "may consider the exhibits attached to the complaint." *Dalziel Dalzeal LLC v. Mellberg*, No. 22-10625, 2024 WL 470363, at *3 (11th Cir. 2024). The Court may only consider documents not attached to a complaint but

incorporated by reference through "a clear, definite and substantial reference to the document." *Scott v. Westchester Cnty.*, 434 F. Supp. 3d 188, 197 (S.D.N.Y. 2020) (quoting *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)). "A document may be deemed incorporated by reference if the plaintiff refers *extensively* to the document or the document forms the basis of the plaintiff's claim." *Callen v. Resonant Inc.*, 709 F. Supp. 3d 1021, 1025 (C.D. Cal. 2023) (emphasis added). "To qualify as 'extensively referenced,' the complaint must cite the document at least more than once or quote from it at length; merely mentioning the existence of a document is insufficient." *Id.*; *see also Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) ("A mere passing reference or even references, however, to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself.").

## ARGUMENT

Chainalysis opens its brief with revisionist history, claiming that "*Celsius* disclosed its AUM" and "*Celsius* issued a press release"—as if it were a passive observer rather than an active co-author of a fraudulent joint narrative.[3] But the Complaint paints a starkly different picture. The inflated AUM was no innocent mistake; it was a scheme by the Insiders to deceive the public, inflate token demand, and cash out their CEL holdings at a profit. Chainalysis knew the numbers were false, reviewed the calculations, approved the methodology, and let its Chief Revenue Officer publicly vouch for them.

Desperate to distance itself from this conduct, Chainalysis improperly relies on materials outside the Complaint in an effort to shoehorn the facts into an *in pari delicto* defense. For instance, Chainalysis cites the Examiner's Report to argue that CEL's price increase was due solely to the

---

[3] *See* ECF No. 24 at 9 and 13, respectively (emphasis added). Defendant Chainalysis Inc.'s Memorandum of Law In Support of Its Motion to Dismiss the Complaint will be cited as (Mot. at __) and will refer to the page number supplied by **CM/ECF** at the top of the page.

Insiders' buybacks, not the Press Release—raising a factual dispute inappropriate for a motion to dismiss. Mot. at 16-17. But even these extra-record materials support the core allegation: Celsius was not a benefactor of the fraud, but the victim—forced to spend millions buying overvalued CEL tokens to meet its obligations to customers, for the sole benefit of the Insiders.

Chainalysis's position also contradicts the well-pled allegations (Compl. ¶¶61-69), which must be accepted as true, and ignores that the Insiders executed multiple interrelated fraudulent schemes to achieve their goals. The joint Press Release was no sideshow—it was integral to the Insiders' breaches of fiduciary duties. It validated the false AUM, inflated CEL's price, and fueled the collapse Chainalysis now disclaims. At this stage, the fact that other misconduct may have contributed does not defeat the claim; questions of causation and damages are typically fact-intensive and often not appropriate for resolution on a motion to dismiss.

Chainalysis's scattershot attempt to escape liability under various state consumer protection laws fares no better. The facts alleged are more than enough to proceed.

## I.    THE *IN PARI DELICTO* DOCTRINE DOES NOT BAR PLAINTIFF'S AIDING AND ABETTING CLAIM

Chainalysis leans heavily on *Kirschner v. KPMG LLP*, 15 N.Y.3d 446 (2010), to invoke the doctrine of *in pari delicto*, which bars claims between joint wrongdoers.[4] But its reliance is

---

[4] Chainalysis also refers to the *Wagoner* Rule, derived from *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir. 1991), which generally provides that a bankruptcy trustee steps into the shoes of the debtor and lacks standing to sue third parties if misconduct by the debtor's employees is imputed to it, unless an exception like the adverse-interest exception applies. *In re Adelphia Communications Corp.*, 330 B.R. 364, 379 n.45 (Bankr. S.D.N.Y. 2005).

Although the *Wagoner* Rule and the doctrine of *in pari delicto* are technically distinct, with the former being a standing doctrine and the latter an affirmative defense, the analysis is the same and often analyzed together by courts. *See In re BC Funding, LLC*, 519 B.R. 394, 414 (Bankr. E.D.N.Y. 2014). Accordingly, rejecting application of *in pari delicto*—as should occur here—should lead to the same conclusion as to the *Wagoner* Rule.

both premature and misplaced. Under well-established law, the doctrine does not apply where insiders acted adversely to the corporation—a key allegation in the Complaint.

### A.    The Adverse Interest Exception Squarely Applies.

As *Kirschner* itself makes clear, "[t]he doctrine of *in pari delicto* mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Id.* at 464. "Application of the doctrine of *in pari delicto* requires that the plaintiff be an active, voluntary participant in the unlawful activity that is the subject of the suit, and bear **at least substantially equal responsibility for the underlying illegality.**" *Allstate Ins. Co. v. A & F Med. P.C.*, No. 14-CV-6756 (JBW), 2017 WL 4350418, at *8 (E.D.N.Y. Apr. 24, 2017) (cleaned up and internal citations omitted) (emphasis in original).

The doctrine of *in pari delicto* does not apply where, as here, insiders acted solely for their own personal gain and in conflict with the corporation's interests. This follows basic agency principles: while an agent's actions are generally imputed to the principal when taken within the scope of authority, the "adverse interest exception" applies when the agent "totally abandoned his principal's interests and [acted] entirely for his own or another's purposes." *Kirschner*, 15 N.Y.3d at 466-67.

Chainalysis cannot sidestep the Complaint's allegations, which must be accepted as true at this stage. The Complaint plainly alleges conduct by the Insiders outside the scope of *in pari delicto*. This is not a case of "two wrongdoers." Celsius was the <u>victim</u> of the Insiders' breaches of fiduciary duties—not a participant. The Insiders orchestrated a scheme to enrich themselves to the detriment of Celsius by falsifying Celsius's financial condition and, with Chainalysis's assistance, disseminating those falsehoods to inflate the value of their CEL holdings. (Compl. ¶¶

33-40.) They then sold their CEL tokens at a profit while causing Celsius to buy CEL at the inflated prices, draining corporate assets. (*Id.* at ¶¶ 68-72, 77.)

As the Complaint explains: "Celsius was buying the same CEL that the Insiders were selling in a directly adversarial process where the Insiders sold CEL at a profit and Celsius bought that CEL at a loss.  The self-dealing by the Insiders amounts to looting.  The Insiders undertook those actions solely for their personal benefit, thereby resulting in harm to Celsius." (*Id.* at ¶72.) Their conduct served no legitimate corporate purpose and was directly adverse to Celsius. Chainalysis's own motion acknowledges that Celsius's founder was sentenced to 12 years in prison for his fraudulent actions, including the scheme alleged in the Complaint, underscoring its fundamentally self-serving nature. Courts routinely hold that such looting and corporate harm trigger the adverse interest exception.

For example, in *RocketFuel Blockchain Co. v. Ellenoff Grossman & Schole LLP*, the court rejected application of *in pari delicto* at the motion to dismiss stage where the agent's fraud was aimed at harming the company itself. The court emphasized that *in pari delicto* cannot apply when plaintiffs allege they were victims. 2022 WL 80482, at *3 (S.D.N.Y. Jan. 7, 2022) (citing *Kirschner*, 15 N.Y.3d at 466).

Similarly, in *Buckley v. Deloitte & Touche USA LLP*, 06-CIV-3291-SHS, 2007 WL 1491403 (S.D.N.Y. May 22, 2007), the court held that allegations of "self-dealing, and perhaps even looting," along with insider fraud for personal gain, precluded dismissal under *in pari delicto*. *Id.* at *7 (quoting *In re Parmalat Sec. Litig.,* 383 F. Supp. 2d at 599) ("theft from a corporation by insiders is self dealing . . . and not in any sense in the interest of the entity. The insiders' actions and knowledge in engaging in such conduct therefore cannot be imputed to the company."); *see also Conway v. Marcum & Kliegman LLP*, 176 A.D.3d 477, 478 (1st Dep't 2019) (rejecting

speculation that continued corporate existence justified insider misconduct, noting that prolonging a company's life simply to "continue to loot from it" harms the entity); *re Adelphia Communications Corp.*, 330 B.R. 364 (Bankr. S.D.N.Y. 2005) (declining to apply *in pari delicto* doctrine where insiders looted the company for their own benefit, not the company's).

The same result follows here. The Complaint alleges that Celsius Insiders—enabled by Chainalysis's knowing involvement in the joint Press Release—executed a scheme to enrich themselves, not the company. By disseminating false AUM figures and methodology, they grew the customer base, sold their personal holdings at a profit, and depleted company funds through CEL buybacks. (Compl. ¶¶ 44–46, 53, 61–63, 70-72.) This was not mismanagement; it was personal greed at Celsius's expense and was among the forces that drove Celsius into bankruptcy. The Complaint further alleges that Chainalysis lent legitimacy to the breach of fiduciary duty, even as the Insiders acted solely for their own benefit. Taken as true, these facts show a complete abandonment of corporate interests and trigger the adverse interest exception.

Nor was Chainalysis duped. It knowingly facilitated a misleading financial narrative that deceived investors, directors, regulators, and customers alike. That knowing participation takes this case well outside *Kirschner* and squarely within the adverse interest exception. *Cf. Bullmore v. Ernst & Young Cayman Islands,* 20 Misc.3d 667 (Sup. Ct. N.Y. Cty. 2008) (cited in Mot. at 18) (an auditor's alleged passive negligence in failing to detect a valuation fraud perpetrated by fund managers who, the court found, acted at least in part to benefit the fund by attracting investor capital—thus precluding application of the adverse interest exception at the summary judgment stage). The Complaint plausibly alleges that Celsius was the victim of the Insiders' misconduct and that Chainalysis knowingly aided in the deception. That is more than sufficient to defeat a motion to dismiss

**B.    Chainalysis's *In Pari Delicto* Argument Is Premature, at Best.**

Chainalysis's *in pari delicto* defense is not only legally flawed—it is also premature. Courts have repeatedly cautioned that dismissal on *in pari delicto* grounds is proper only when its application is clear from the face of the pleadings. *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 162 (2d Cir. 2014) (the doctrine of in pari delicto should only be applied on the pleadings if the outcome is plain); *see also Gatt Communications, Inc. v. PMC Associates, LLC,* 711 F.3d 68, 80–81 (2d Cir. 2013) (noting that *in pari delicto* is generally applied at summary judgment or trial). The weighing of relative fault, and thus the applicability of the *in pari delicto* doctrine, is a fact-intensive inquiry that generally should not, and often cannot, be undertaken on a motion to dismiss. *See id.* Courts have declined to apply the doctrine at the pleading stage where, as here, the complaint alleges that corporate insiders acted for their own personal gain and to the company's detriment.

For example, in *Buckley v. Deloitte & Touche USA LLP*, 06-CIV-3291-SHS, 2007 WL 1491403 (S.D.N.Y. May 22, 2007), the court rejected *in pari delicto* at the motion to dismiss stage where the complaint alleged that insiders looted the company with the help of an outside auditor. The court held that dismissal is improper if the complaint leaves open the possibility that the insiders' misconduct was adverse to the company's interest. *See id.* at *5-6. The court emphasized that whether the adverse interest exception applies is a fact-intensive inquiry that generally cannot be resolved at the pleadings stage. *Id.* at *5 (string citing several cases). Even where some courts have applied the doctrine at the pleading stage, allegations involving looting, or cases where the question of imputation is even a close call, must be left to the factfinder. *Id.*

Other courts have echoed this caution. *See Glob. Crossing Est. Rep. v. Winnick*, 04 CIV. 2558 GEL, 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006) (application of *in pari delicto* "may

hinge on certain fact based considerations that cannot be addressed at the pleadings stage"); *In re Hellas Telecomm. (Luxembourg) II SCA*, 524 B.R. 488, 534 (Bankr. S.D.N.Y. 2015), *adhered to*, 526 B.R. 499 (Bankr. S.D.N.Y. 2015) (same); *Conway,* 176 A.D.3d at 478 (denying motion to dismiss on *in pari delicto* grounds because there existed factual questions as to whether the companies where victims or beneficiaries of the fraud).

Plaintiff firmly maintains that the facts of this case foreclose any application of the *in pari delicto* doctrine at any stage of these proceedings. The Celsius insiders acted solely for their own benefit—and Chainalysis knowingly facilitated the AUM scheme—placing this case squarely within the adverse interest exception. But regardless of what Chainalysis may try to argue after discovery, any determination on *in pari delicto* is premature at the pleading stage and cannot support dismissal.

### C.    Equitable Considerations Bar Application of *In Pari Delicto.*

Finally, equitable considerations weigh heavily against applying *in pari delicto* here. *See Buckley*, 2007 WL 1491403, at *8 (courts must consider equity when deciding whether to apply *in pari delicto*); s*ee also In re Personal & Bus. Ins. Agency*, 334 F.3d 239, 246 (3d Cir. 2003) (rejecting imputation where it would lead to an inequitable result).

Allowing Chainalysis to evade liability at this early stage would send a troubling message: that a self-described authority in blockchain analytics can lend its credibility (for its own benefit) to a false press release, publicly and knowingly endorse a false audit, and then disclaim responsibility. *See Buckley*, 2007 WL 1491403, at *8 ("the Court must be mindful of the objectives of tort liability, which include the deterrence of future wrongdoing.").

This was not passive conduct. Chainalysis was an active participant in the deception—the Complaint alleges that Chainalysis actively helped draft the December 9, 2020 joint Press Release,

reviewed and approved the false AUM figure, and publicly vouched for its accuracy through a quote from its Chief Revenue Officer. (Compl. ¶¶ 4, 48–51, 54.) Chainalysis had a clear motive: as a newcomer in the crypto space, it stood to further build its brand by aligning with Celsius. (Compl. ¶¶ 6, 66.) This mutually beneficial arrangement—Celsius gained perceived credibility, and Chainalysis gained market exposure—further undermines any equitable basis for dismissal.

## II.    THE COMPLAINT ADEQUATELY ALLEGES THAT CHAINALYSIS HAD ACTUAL KNOWLEDGE AND ACTIVELY PARTICIPATED

"Third-party analysis provides transparency with independent verification and proof of funds." False. "[C]ompletion of an audit confirming $3,318,368,196.40 of assets by Chainalysis." False. "'Celsius Network asked us to help provide transparency to its community by verifying the process and accuracy of the information related to the net funds collected by Celsius,' said Jason Bonds, Chief Revenue Officer at Chainalysis. 'This process included accounting for other $7.609B in deposits and 4.290B in withdrawals.'" Also false. Every one of these statements was untrue— and Chainalysis knew it.

The Press Release is riddled with falsehoods—many of which Chainalysis made directly, helped draft, or expressly approved. These false statements were further amplified by Chainalysis's repeated claims of transparency, verification, and accuracy, including its branding as the "Chainalysis audit" and boasting its nearly two-year involvement with Celsius.

Aiding and abetting requires only that the defendant had actual knowledge of the wrong and provided substantial assistance. The Complaint easily satisfies these elements.

Yet Chainalysis now argues that the Complaint fails to allege its knowledge or participation, mischaracterizing the allegations as mere inaction or ignorance. This is plainly inaccurate. The Complaint clearly alleges that Chainalysis knew the AUM, the claims of an "audit," "transparency," "third-party verification," and the purported methodology used to

calculate the AUM were all false—and nonetheless *actively participated* in creating and disseminating those falsehoods.

Specifically, the Complaint alleges that Chainalysis:

- Had direct access to Celsius's calculations, the Reactor calculations, and the underlying data supporting the initial calculations (Compl. ¶ 44);

- Knew that the revised AUM figure published in the Press Release was significantly inflated compared to the number calculated by its own Reactor software  (Compl. ¶ 54);

- Reviewed and approved both the misleading methodology and the underlying false data, including the inflated AUM figure (Compl. ¶ 55-60);

- Understood that the methodology used was misleading, and that the inclusion of CEL grossly inflated the actual value of Celsius's assets (Compl. ¶ 50).

- Reviewed, edited, and approved the joint December 9, 2020 Press Release falsely representing that Celsius held $3.31 billion in AUM (Compl. ¶¶ 48–49, 51);

- Provided an affirmative quote from its Chief Revenue Officer for inclusion in the Press Release, expressly vouching for the accuracy and integrity of the reported AUM (Compl. ¶ 49);

- Knew that its CRO's public statement was false and misleading at the time it was made (Compl. ¶ 55-56); and

- Falsely confirmed that an "audit" and "independent third-party verification" of Celsius's AUM had occurred, knowing no such audit or verification existed (Compl. ¶ 57-58).

In short, the Complaint alleges that Chainalysis knowingly furthered the deception—it did not merely fail to act. With full knowledge of the falsehoods, it affirmatively and knowingly chose to endorse and disseminate them.

In its motion, Chainalysis protests that it "is not an accounting firm" and does not "offer accounting software," implying it lacked the capacity to conduct an "audit," "independent verification," or "third-party confirmation" of Celsius's AUM. (Mot. at 9.) Even if true, that only underscores its culpability. Knowing it lacked the ability to audit or verify, Chainalysis nonetheless

published a Press Release claiming *it did just that*—knowingly promoting this falsehood for strategic gain. *See* Compl. ¶¶ 42, 49-50.

Chainalysis also wrongly suggests that the Complaint fails to allege it knew the AUM was inaccurate or that including CEL in the calculation was improper. That ignores the well-pled allegations. The Complaint alleges that Chainalysis had access to Celsius's calculations, the Reactor calculations, and the underlying data, and that it knew there was no audit or verification (a fact now admitted by Chainalysis in its Motion). (Compl. ¶¶ 44, 50, 54, 57.) Despite this, it publicly stood behind the inflated AUM. *Id.* The Complaint also alleges that, in addition to knowing that the AUM was false, Chainalysis knew that the quote by its Chief Revenue Officer was materially false. (*Id.* at ¶ 49, 50,54-57).

These are not vague or conclusory claims—they are specific well-supported allegations backed by the Press Release itself (attached as Ex. A to the Complaint), which refutes Chainalysis's attempt to cast itself as a passive or uninformed participant.

Chainalysis's reliance on *Lerner v. Fleet Bank*, 459 F.3d 273 (2d Cir. 2006), is unavailing. In *Lerner*, an attorney defrauded investors by misusing client funds held in trust accounts. *Id.* at 281. Although the plaintiffs alleged several "red flags" to show the bank' knowledge of the attorney's fraud, such as overdrawn accounts and bounced checks, the court found those allegations insufficient to support aiding and abetting *fraud*. *Id.* at 294. However, it allowed aiding and abetting *breach of fiduciary duty* claims to proceed, holding that such claims do "not depend on such knowledge of [the fraud]." *Id.* Indeed, the court held that the bank's knowledge of commingling of funds (which constituted a breach of fiduciary duty in itself) was sufficient to state a claim for aiding and abetting. *Id.* at 294.

Far from supporting dismissal, *Lerner* affirms that a defendant may be liable for aiding and abetting breach of fiduciary duty where it knowingly facilitates misconduct—precisely what is alleged here. The Complaint details how the Insiders falsely claimed that the AUM had been audited and independently verified by Chainalysis—an obvious breach of their fiduciary duties to Celsius. *See, e.g.*, *Meinhard v. Salmon*,  164 N.E. 545, 546 (1928) (Fiduciaries are "held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."); *In re Ideal Mortgage Bankers, Ltd*, 539 B.R. 213, 219 (Bankr. E.D.N.Y. 2015) ("A corporate officer's fiduciary duty includes discharging corporate responsibilities in good faith and with conscientious fairness, morality and honesty in purpose and displaying good and prudent management of the corporation.").

As in *Lerner*, the Complaint alleges that Chainalysis had actual knowledge of the breach. It knew there had been no audit, verification, or confirmation of the AUM—yet publicly endorsed these claims and attributed them to its own Chief Revenue Officer. (Compl. ¶¶ 54-60) Having voluntarily attached its name and credibility to the deception, Chainalysis cannot now disclaim responsibility. These allegations clearly satisfy the knowledge and substantial assistance prongs and are in stark contrast to the cases relied upon by Chainalysis. *Contra Krys v. Butt*, 486 Fed. Appx. 153, 157 (2d Cir. 2012) (Mot. at 20) (no allegations of knowledge); *In re FTX Cryptocurrency Exch. Collapse Litig.,* No. 1:23-MD-3076-KMM, 2025 WL 1341173, at *17 (S.D. Fla. May 7, 2025) (Mot. at 20) (alleging defendants "should have known"); *Talipot ESG Invs. LLC v. Bulltick Fin. Advisory Servs. LLC,* 8 5 Misc. 3d 1234(A), 2025 N.Y. Slip Op. 50349(U), at *13 (Sup. Ct., N.Y. Cnty. 2025) (Mot. at 20) (no allegations of falsity, knowledge, or that the defendant personally communicated any false statements).

The allegations here closely mirror those sustained in *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d 349 (S.D.N.Y. 2007), where the court upheld aiding and abetting claims against brokers who provided purportedly independent valuations that were, in truth, dictated by the fund manager and used to mislead investors and auditors. There, the brokers rubber-stamped pricing data they knew to be inaccurate—or at minimum had every reason to question—allowing those false values to be included in the fund's audited financial statements. *Id.* at 354-55, 370. The court found such conduct sufficient to establish both substantial assistance and actual knowledge. *Id.* at 370-71.

Here, the Complaint alleges that Chainalysis played a nearly identical role: publicly endorsing Celsius's AUM as "independently verified" and "audited," knowing it was false. Like the brokers in *Fraternity Fund*, Chainalysis served as a trusted intermediary, lending its name and credibility to validate figures it had no basis to confirm. *See id.* at 373. Just as the *Fraternity Fund* court rejected dismissal where brokers corroborated values they knew they had not verified, the same outcome is warranted here.

Moreover, *Fraternity Fund* affirmed that knowledge may be inferred where red flags are ignored. There, the broker's knowledge was inferred from requests to brand manipulated values with its letterhead. 479 F. Supp. 2d at 370. While the Complaint adequately alleges direct knowledge, it also pleads additional facts that mirror the same red flags present in *Fraternity Fund*: Celsius's AUM inexplicably jumped in less than one month by over $1 billion between internal drafts sent to Chainalysis and the final published figure (i.e. $3.3 billion)—a red flag Chainalysis chose to ignore. (Compl. at ¶¶ 44-48, 55). Chainalysis endorsed the inflated numbers and falsely stated the AUM had been independently audited.

In short, this is not a case where the defendant is alleged to have merely missed a red flag in someone else's financials or passively forwarded someone else's misleading document. The Complaint alleges that Chainalysis was a knowing, willing participant that knew: 1) the stated AUM was false, 2) the statement in the Press Release attributed to its Chief Revenue Officer was false, 3) the process involved more than a simple counting of "total deposits and total withdrawals," as claimed and instead included the addition of CEL and deployment assets, 4) there was no "audit," "independent verification," or "third-party verification" of the stated AUM, and 5) lying about the AUM could only be motivated by a desire to fraudulently attract customers, boost CEL price, and enhance reputation to make Celsius appear more successful and stable than it actually was.  (Compl. at ¶¶ 50, 54-59.)

Despite that knowledge, Chainalysis not only approved the Press Release, but provided a public quote affirming its accuracy, thereby ratifying and amplifying the deception. (*Id.* at ¶ 60.) That is more than enough to plead knowledge and substantial assistance at this stage.

## III.    THE STATE CONSUMER CLAIMS ARE SUFFICIENTLY PLED

Chainalysis's blanket assertion that the Complaint fails to plead any elements of the consumer protection claims is both inaccurate and unsupported. It ignores the detailed, element-by-element allegations in the Complaint and improperly demands a heightened pleading standard.

Notably, Chainalysis offers no explanation for how the well-pleaded allegations are purportedly deficient.[5]

### A. The Complaint Sufficiently Pleads Causation and Reliance by the Contributed Claimants.

First, not all of Plaintiff's consumer claims require reliance.[6] And where reliance is required, it is sufficiently pled by identifying the false statements, when and where they were made, and how consumers relied on them. *See, e.g.*, *Gomez-Jimenez v. New York Law Sch.*, 36 Misc. 3d 230, 254, 943 N.Y.S.2d 834, 853 (Sup. Ct. 2012), aff'd, 103 A.D.3d 13, 956 N.Y.S.2d 54 (2012). The Complaint alleges that on December 9, 2020, Celsius Insiders and Chainalysis jointly issued a press release falsely touting that Celsius's $7.197 billion AUM figure had been independently audited and verified. (Compl. ¶¶ 48-60.) The Complaint further alleges that the Press Release was widely disseminated—including to CEL purchasers—with the intent to instill public confidence. *See* (Compl. ¶¶ 53, 59, 69.) Consumers reasonably relied on these misrepresentations. Had they known the truth, they would not have purchased CEL, paid as much for it, or entered programs that paid in CEL. *See* (Compl. ¶¶ 96-101; 108-14; 121-26; 131-36; 141-

---

[5] Chainalysis makes a cursory argument that Plaintiff must identify each individual contributed claimant. However, Chainalysis fails to cite a case that supports that proposition. Instead, the case relied upon by Chainalysis dismissed the claims brought on behalf of unnamed class members in each state because the complaint failed to allege purchases were made in any state other than New York, a deficiency not present in the Complaint here. *See Chimienti v. Wendy's Int'l, LLC*, 698 F. Supp 3d 549, 562 (E.D.N.Y. 2023) (Mot. at 15) (rejecting class claims in states other than New York where the complaint only alleged facts specific to New York).

[6] *Gomez-Jimenez v. New York Law Sch.*, 36 Misc. 3d 230, 237, 943 N.Y.S.2d 834, 840 (Sup. Ct. 2012) (reliance not required under New York Deceptive Practices Act); *Gundel v. AV Homes, Inc.*, 290 So. 3d 1080, 1087 n.5 (Fla. 2d DCA 2020) (reliance not required under FDUPTA); *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998) (reliance not required under Colorado CPA); *Young v. Toyota Motor Sales, U.S.A.*, 196 Wash. 2d 310, 318, 472 P.3d 990, 994 (2020) (reliance not required under Washington CPA); *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 394, 813 N.E.2d 476, 486 (2004) (reliance not required under Massachusetts CPA).

45; 155-59; 165-70; 176-81; 187-92; 198-203; 209-214; 220-25; 233-38; 244-49.) These allegations sufficiently plead both reliance and causation.

Causation is also well supported for the contributed claims. In *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d 349 (S.D.N.Y. 2007), the court found causation was adequately pled where investors relied on false valuations provided by third-party brokers. *Id*. at 370–71. The same logic applies here: the contributed claimants were foreseeable recipients of a misrepresentation bearing Chainalysis's endorsement and were misled into trusting Celsius and maintaining exposure to CEL under false pretenses. That is more than sufficient to plead proximate cause.

### B. Chainalysis Improperly Goes Beyond the Four Corners of the Complaint and Attempts to Litigate the Facts Through Its Motion to Dismiss.[7]

Chainalysis's reliance on the so-called "Examiner's Report" (Mot. at 24-25) is improper at the motion to dismiss stage. The Report is neither incorporated into the Complaint nor integral to Plaintiff's claims[8], and may not be used to resolve factual disputes on a Rule 12(b)(6) motion. It is black-letter law that courts are limited to the four corners of the complaint and its attached exhibits. *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 71 (2d Cir. 1998).

A document not attached to a complaint may be considered only if there is "a clear, definite and substantial reference to the document," not merely passing references. *Scott v. Westchester*

---

[7] Chainalysis also boldly asserts that the Press Release was not misleading. (Mot. at 18-19). As outlined above, this is plainly false.

[8] Nor was the Examiner's Report ever approved by any court—it simply provided the Examiner's findings, which renders the Examiner's Report outside of the type of documents of which the Court can take judicial notice. Even where a court may take judicial notice of public documents, it may not accept as true the Report's factual findings or disputed interpretations, nor may it use such materials to resolve contested factual issues on a motion to dismiss. *Scott v. Westchester Cnty.*, 434 F. Supp. 3d 188, 196 (S.D.N.Y. 2020); *see also Van Woudenberg v. Gibson*, 211 F.3d 560 (10th Cir. 2000).

*Cnty.*, 434 F. Supp. 3d 188, 197 (S.D.N.Y. 2020) (quoting *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)); *see also Callen v. Resonant Inc.*, 709 F. Supp. 3d 1021, 1025 (C.D. Cal. 2023) (A document may be deemed incorporated by reference only if it forms the basis of the claim or is referenced *extensively*, merely mentioning the document is insufficient); *Dejesus v. HF Mgmt. Services, LLC*, No. 1:12-CV-1298 ERK RML, 2012 WL 5289571, at *3 (E.D.N.Y. Oct. 23, 2012), *aff'd*, 726 F.3d 85 (2d Cir. 2013) (same).

The Complaint mentions the Examiner's Report once—in a footnote—just to identify the source of a chart illustrating customer registrations. It does not quote, summarize, or rely on the Report for any allegation. That passing reference is far from incorporation by reference. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) ("The amended complaint merely discussed these documents and presented short quotations from them. Limited quotation does not constitute incorporation by reference.")

Chainalysis nonetheless improperly asks the Court to treat the Report as if it were an adjudicative finding, selectively interpreting its contents to dispute the Complaint's allegations—particularly by claiming that the CEL price increase cannot be tied to the Press Release. But the Complaint alleges the opposite. These are quintessential factual disputes that cannot be resolved on a motion to dismiss. *See Pearson v. Gesner*, 125 F.4th 400, 406 (2d Cir. 2025) (court must resolve 12(b)(6) motion "based solely on the allegations in the complaint" unless converted to summary judgment and give the parties the opportunity to conduct appropriate discovery).

Chainalysis is free to raise arguments about the Examiner's Report at summary judgment or trial, where evidence may be properly tested. But its attempt to inject and rely on external materials at the pleading stage should be rejected.

### C. Count 12 Is Properly Brought by Plaintiff.

Plaintiff acknowledges that certain state consumer protection claims[9] may not be assignable under current law, and therefore do not oppose dismissal at this time. Plaintiff reserves all rights, however, to assert such claims in the future should new authority or facts support their assignability.

Chainalysis, however, is incorrect about the assignability of Count 12 (Colorado CPA). The Colorado CPA expressly permits claims by "any successor in interest to an actual consumer who purchased the defendant's goods, services, or property," Colo. Rev. Stat. § 6-1-113(1)(b), but does not limit liability to direct sellers or require privity. Rather, it broadly imposes liability on any person who either engages in deceptive conduct or *causes another* to do so, encompassing knowing facilitators of consumer deception. *See id.* § 6-1-113 ("The provisions of this article shall be available in a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice listed in this article."). The Complaint sufficiently alleges deceptive trade practices by Chainalysis under Colo. Rev. Stat. § 6-1-10. Under the requisite liberal interpretation, secondary actors who knowingly participate in deceptive schemes may also be held accountable. *See Dalton v. Countrywide Home Loans, Inc.*, 828 F. Supp. 2d 1242, 1250 (D. Colo. 2011) ("To effectuate its remedial purpose, the CCPA is to be "liberally construed.").

---

[9] Counts 4 (New Jersey CFA), 6 (UCL), 7 (FAL), 9 (Texas DTPA), 10 (Virginia CPA), and 15 (NCDAPA).

**D. The State Consumer Protection Claims Are Not Time-Barred.**

> 1. _Accrual Under the Discovery Doctrine is a Question of Fact Not Suitable to Determination on a Motion to Dismiss (Counts 8 and 16)_

Arizona and California have adopted the discovery rule, which tolls the statute of limitations until a plaintiff discovers, or with reasonable diligence could have discovered, the alleged wrongdoing. *See, e.g.*, *Alaface v. Nat'l Inv. Co.*, 892 P.2d 1375, 1379 (Ariz. Ct. App. 1994). This rule applies to consumer protection claims and reflects a strong judicial preference for resolving cases on their merits. *See id*; *see also Coulter v. Grant Thornton, LLP*, 388 P.3d 834, 838 (Ariz. Ct. App. 2017) (reversing dismissal because date of accrual is a question of fact) (internal quotations omitted); *see also Brooks v. Tarsadia Hotels*, No. 3:18-CV-2290-GPC-KSC, 2019 WL 6611506, at *10 (S.D. Cal. Dec. 5, 2019) (denying motion to dismiss on statute of limitations under California law).

"The date when discovery occurred is a question of fact. For this reason, a plaintiff's allegations about the date of discovery must be accepted as true at the 12(b)(6) stage, and a claim should not be dismissed as untimely unless the running of the statute of limitations is "apparent on the face of the complaint." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 826 (D. Ariz. 2016) (Mot. at 29) (denying dismissal based on statute of limitations)*; Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998) (denying summary judgment based on statute of limitations) ("Inquiries involving the discovery rule usually entail questions for the trier of fact."); *Rushing v. Williams-Sonoma, Inc.*, No. 16-CV-01421-WHO, 2022 WL 2833980, at *6 (N.D. Cal. July 20, 2022) (applying California law, denying summary judgment on claims under UCL, FAL, and CLRA because "[t]he question when a plaintiff actually discovered or reasonably should have discovered the facts for purposes of the delayed discovery rule is a question of fact unless the evidence can support only one reasonable conclusion."). Because the Complaint does not foreclose the

28

possibility that Plaintiff's claims are timely under the discovery rule, dismissal on statute of limitations grounds is improper at this stage

> 2. *Chainalysis Incorrectly Asserts the Date the Injury Occurred Under New York Law (Counts 2 and 3)*

Chainalysis argues that a three-year statute of limitations bars Counts II and III, but this argument misstates New York law. Under GBL §§ 349 and 350, claims accrue when the injury occurs—not when the defendant commits the deceptive act. *See Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 210 (2001). The core injury here is consumers purchasing or receiving CEL tokens or enrolling or staying enrolled in Celsius programs after being deceived by the materially false December 9, 2020 joint Press Release (Compl. ¶¶ 4, 48-52, 95-98, 109-111.)

But the harm was not limited to a single moment. The Press Release launched an ongoing scheme, followed by additional false announcements on January 20, March 10, and August 24, 2021, all using the same false Chainalysis-approved methodology.  (*Id*. ¶¶ 63-66.) CEL prices surged through mid-2021 (*Id*. ¶¶ 68–69), and customers continued to purchase and receive CEL and join programs and stay in programs throughout 2021 and into 2022. (*Id*. ¶ 74.) These rolling injuries extended the accrual of claims into late 2024 or 2025. (*Id*. ¶ 74). Because the parties entered into a tolling agreement before the expiration of the statute of limitations, (Mot. at 29, n.19), the claims are timely. In any event, dismissal is improper unless untimeliness is clear from the face of the complaint. Where the timing of injury or discovery is reasonably in dispute, the issue must go to the factfinder.  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004)

**D.    The State Consumer Protection Claims Sufficiently Allege a Nexus to the Respective States (Counts 5, 14, And 16).**

Each state consumer protection count contains allegations to the same effect: Chainalysis misrepresented or concealed material facts about Celsius and CEL with the intent that consumers

in that state would rely on them; that those misrepresentations were likely to—and did—mislead consumers who saw and relied on them; and that, had the truth been known, consumers would have avoided purchasing or receiving CEL or participating in Celsius programs. The Complaint also alleges that Chainalysis owed a duty to disclose material facts due to its exclusive knowledge and active concealment, and that consumers in each state suffered actual and ascertainable losses as a direct result.

In other words, the Complaint alleges that Chainalysis published the misleading statements and deceived consumers in each of the alleged states, including Florida, Arizona, and Massachusetts; that Chainalysis knew its misrepresentations would mislead consumers in each of those states; and that consumers in each respective state were, in fact, injured there. This sufficiently alleges a connection to each state. *See Koch v. Royal Wine Merchants, Ltd.,* 847 F. Supp. 2d 1370, 1380–81 (S.D. Fla. 2012) (FDUTPA is a "statutory tort," and courts look to Florida's long-am statute to determine jurisdiction); *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 257 (11th Cir. 1996) (Florida's long-arm statute permits federal courts to exercise personal jurisdiction over nonresident defendants when a foreign tortious act causes injury in Florida.); *Vanguard Specialized Funds v. VEREIT Inc.*, No. CV-15-02157-PHX-ROS, 2016 WL 5858735, at *10 (D. Ariz. Oct. 3, 2016) (discussing *State ex rel. Corbin v. Goodrich*, 151 Ariz. 118, 124 (App. 1986), which held that ACFA applied to the sale of securities to Arizona residents over the phone by a Michigan company. And holding that the ACFA does not only apply to acts committed entirely within Arizona.); *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473, 781 N.E.2d 787, 799 (2003) (whether the center of gravity is primarily and substantially within the Commonwealth should not be based on a test identified by any particular factor and the inquiry is a question of fact.). Although the misconduct here was nationwide, the Complaint

30

sufficiently alleges that, for consumers in each relevant state, the conduct, deception, and resulting harm were felt *locally*, satisfying each statute's territorial scope.

### E.   Chainalysis's Claims of Deficient Pre-Suit Notice Fail (Counts 8 And 14).

Chainalysis argues that three counts should be dismissed for lack of pre-suit notice—a technicality aimed at defeating otherwise valid claims.[10] But the burden lies with Chainalysis to show how Plaintiff's course of action undermined the purpose these notice provisions, which exist to allow defendants an opportunity to cure alleged violations before litigation. *See Morgan v. AT&T Wireless Services, Inc.*, 99 Cal. Rptr. 3d 768, 789 (Ct. App. 2009).

Courts consistently hold that dismissal with prejudice is unnecessary—and inappropriate— where it would frustrate the broader consumer protection purpose of these statutes. *See Oh v. Catalina Snacks, Inc.*, 764 F. Supp. 3d 903, 923 (C.D. Cal. 2025); *see also York v. Sullivan*, 369 Mass. 157, 163, 338 N.E.2d 341, 346 (1975) (CPA pre-suit notice is not jurisdictional, and should not be used to create procedural barriers). At most, a claim may be dismissed *without prejudice* to allow the defendant 30 days' notice. *See id.*; *see also York*, 338 N.E.2d at 346 (questioning whether dismissal is even appropriate if the notice issue is raised more than 30 days after the complaint is filed, but stating "[e]ven if dismissal were proper, it should not be 'on its merits' or 'with prejudice.'").

Chainalysis has had more than sufficient notice. It entered into a tolling agreement with Plaintiff in July 2024 and has had nearly a year to assess its potential liability. Nearly 90 days have passed since the Complaint was filed—well beyond any statutory notice period. Sending another letter would serve no purpose.  *See York v. Sullivan*, 369 Mass. 157, 163, 338 N.E.2d 341, 346

---

[10] Plaintiff sent notice letters to Chainalysis on March 22, 2025, pursuant to the notice provisions of the Massachusetts CPA and Texas DTPA. (Compl. ¶¶172, 227)

(1975) ("Demand before suit is often a fruitless ceremony."). This is particularly true here, where the purpose of the notice requirement is to provide an opportunity to cure the alleged wrong. There is nothing Chainalysis can do at this point to correct the false 2020 Press Release or undo the resulting harm. Any further notice would be moot and Chainalysis's attempt to seize on it now is pure gamesmanship.[11]

## CONCLUSION

For the foregoing reasons, Chainalysis's motion should be denied. The Complaint plausibly alleges each element of the asserted claims and meets the applicable pleading standards. Chainalysis's arguments rest on mischaracterizations, premature factual disputes, and technical objections that do not support dismissal. At this stage, the Court must accept the well-pled allegations as true and allow the case to proceed to discovery. Chainalysis should not be allowed to avoid accountability for its role in the falsehoods that harmed Celsius and its consumers. If the Court grants any part of the motion, Plaintiff respectfully requests leave to amend.

---

[11] Chainalysis also briefly argues that Count 8 must be dismissed because it involves cryptocurrency, relying on *Pearl v. Coinbase Global Inc.*, 2024 WL 3416505 (N.D. Cal. 2024). But *Pearl* is inapposite. It does not hold that CLRA claims categorically fail where cryptocurrency is involved. Rather, the court dismissed the CLRA claim because the transaction at issue—a consumer's purchase of the UST stablecoin through an exchange—did not involve either a covered "good" or "service." The court found that Coinbase's mere facilitation of token purchases on its exchange was too limited to qualify as a "service." *Id.* at *6. This case is entirely different. The contributed claims do not arise from mere token purchases. Celsius offered consumer-facing financial services—interest-bearing accounts, custodial services, and crypto-backed loans—and the Press Release induced consumers to deposit and lock assets into those services based on false claims of an "audit" and "independent verification." These are precisely the types of services the CLRA was designed to cover. *See* Cal. Civ. Code §1750, *et seq.*, (CLRA prohibits "unfair or deceptive acts or practices" in connection with the sale of goods or services to any consumer, including (i) misrepresenting the sponsorship, approval, or certification of goods or services; (ii) misrepresenting the affiliation, connection, or association with, or certification by, another; (iii) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; (iv) representing that goods or services are of a particular standard, quality, or grade, if they are of another). Accordingly, *Pearl* offers no basis for dismissal.

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify pursuant to the Local Civil Rule 7.1 of the Joint Local Rules for S.D.N.Y. and E.D.N.Y. that, according to the word count tool in the document processing software used to prepare this memorandum of law, the total number of words herein is 8,358.


Dated:  New York, New York
       June 23, 2025

Respectfully Submitted,

**VENABLE LLP**

*/s/ Jeffrey S. Sabin*
Jeffrey S. Sabin
Xochitl S. Strohbehn
Arie A. Peled
151 West 42nd St., 49th Floor
New York, New York 10036
Telephone (212) 503-0896
Facsimile: (212) 307-5598
Jssabin@venable.com
XSStrohbehn@venable.com
AAPeled@venable.com

-and-

**MARK MIGDAL & HAYDEN**

*/s/ Joshua Migdal*
Joshua Migdal (admitted *pro hac vice*)
Daija P. Lifshitz (admitted *pro hac vice*)
Charles Garabedian (admitted *pro hac vice*)
80 SW 8th St., Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0440
Josh@markmigal.com
Daija@markmigdal.com
Charles@markmigdal.com

*Counsel to Litigation Administrator*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on June 23, 2025, a true and correct copy of *Plaintiff's Response in Opposition to Defendant's Motion to Dismiss and Incorporated Memorandum of Law* was served on all counsel of record via the Court's electronic filing system.

<u>*/s/ Jeffrey S. Sabin*</u>
Jeffrey Sabin