USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/29/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CELSIUS NETWORK LLC, et al.,

Plaintiffs,

-against-

CHAINALYSIS INC.,

Defendant.

25-CV-02669 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Before the Court is Defendant Chainalysis Inc.'s ("Chainalysis") motion to dismiss Plaintiffs' Complaint. For the reasons that follow, the motion is GRANTED in part and DENIED in part. Count One survives, Counts Two, Three, Four, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Fourteen, and Fifteen are dismissed as a matter of law, and Counts Five, Thirteen, and Sixteen are dismissed without prejudice and with leave to amend.

**BACKGROUND**

**I. RELEVANT FACTS[1]**

**A. Celsius' Crypto Platform and CEL Token**

Celsius Network LLC ("Celsius") was a cryptocurrency platform founded by Alexander Mashinsky in 2017 to trade and maintain digital assets. Compl. ¶¶ 2, 23. Celsius initially offered two main products: interest-bearing accounts, in which customers would transfer crypto assets to Celsius in exchange for weekly interest (the "Earn Program"), and low-interest loans secured by crypto holdings posted as collateral (the "Borrow Program"). *Id.* ¶ 24.

[1] This Opinion draws its facts from Plaintiff's Complaint, Dkt. No. 4-1 ("Compl."), the well-pleaded allegations of which are accepted as true for purposes of this Opinion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). The Court refers to the parties' memoranda in support of and opposition to the motion to dismiss as follows: Dkt. No. 24 as "Mot."; Dkt. No. 26 as "Opp."; and Dkt. No. 27 as "Reply."

In March 2018, Celsius issued an initial coin offering ("ICO") to launch its own digital token called "CEL," which became integral to facilitating the Company's programs. *Id.* ¶¶ 25–30. Celsius minted a total of 650 million tokens in the ICO, allocated 50% (325 million) for sale to the public; 23% (149.5 million) to its executive team and select employees, partners, and advisors; and 27% (175.5 million) to the Company's corporate treasury. *Id.* ¶ 31. Despite Mashinsky's public representations that all 325 million CEL offered to the public had been purchased, 36% of the offering, or 117 million CEL, went unpurchased—a disappointing outcome for the Company. *Id.* ¶ 32.

After the ICO, the Earn Program and Borrow Program worked in tandem with Celsius' loyalty program, encouraging users to hold more CEL tokens in their accounts to unlock perks like lower borrowing rates, higher yield on Earn Program accounts, and priority customer support. Celsius' business model therefore depended on customers buying and holding CEL. *Id.* ¶¶ 27–29.

**B. Celsius' Fraudulent AUM Calculation**

As Celsius attempted to offset the underwhelming ICO, Mashinsky and certain Celsius executives (the "Insiders") orchestrated a scheme to spark customer growth by artificially driving demand for CEL through its calculation of assets under management ("AUM"), a critical metric for users deciding whether to deposit assets with Celsius. Compl. ¶¶ 33, 40. The Insiders' goal was to offload their own inflated CEL to the public and ultimately pocket the false profits created by the artificial demand. *Id.* ¶¶ 33–35.

In October 2020, Celsius chose to publicize an audit of its AUM for the first time. *Id.* ¶ 40. Mashinsky enlisted a company called Chainalysis—which marketed itself as "provid[ing] data, software, services, and research to government agencies, exchanges, financial institutions,

and insurance and cybersecurity companies in over 70 countries"—to help conduct the audit using their "Reactor" software and then help to publicize those results. *Id.* ¶¶ 38–41.

On November 2, 2020, a Celsius executive, Timothy Cradle, calculated Celsius's AUM at $1.177 billion using the Chainalysis Reactor software. *Id.* ¶ 41. Shortly thereafter, Chainalysis' Co-Founder appeared in a promotional YouTube video with Mashinsky, posted on Celsius' official YouTube channel. *Id.* ¶ 42. The video jointly promoted both Celsius and Chainalysis, focusing on Chainalysis' services promoting trust and transparency in the crypto space and Celsius' credibility on those metrics because of their use of Chainalysis tools. *Id.*

Meanwhile, the Insiders embarked on a mission to revise Reactor's methodology and enlarge the resultant AUM figure in part by adding the purported value of Celsius' own CEL trove—ultimately resulting in a "highly inaccurate and misleading" $3.3 billion figure. *Id.* ¶¶ 45–46. At numerous steps in this process, Chainalysis, both privately and publicly, blessed Celsius' use of the Reactor tool, its underlying methodology, and the resulting calculations. *Id.* ¶¶ 44, 49–50.

**C. December 9, 2020 Press Release**

On December 9, 2020, armed with the fraudulent and inflated AUM calculation, Celsius issued a press release (the "Press Release") with Chainalysis' help. Compl. ¶¶ 47–48. The Press Release announced "the completion of an audit confirming $3,318,368,196.40 of assets by Chainalysis" that was "based on transactions, total deposits and total withdrawals since launch of the service in June 2018." *Id.* ¶ 48.

Chainalysis played a significant role in the publication of the Press Release and was prominently featured throughout. For example, the Press Release confirmed that the calculation was achieved "through Chainalysis Reactor" and described Chainalysis' and Celsius' close partnership throughout the project. A quote from Chainalysis's then-Chief Revenue Officer

explains that Chainalysis verified "the process and accuracy of the information related to the net funds collected by Celsius." *Id.* ¶¶ 48–50; Dkt. No. 4-1, at 59 ("Celsius Network Partners with Chainalysis to Confirm Audit of $3.31 Billion in Assets"). Chainalysis also played a large role in drafting, editing, and approving the Press Release for publication. Compl. ¶ 51. The Complaint further alleges that Chainalysis knew that the statements in the Press Release, including the claims that Chainalysis conducted an audit and independent verification of the AUM and the stated AUM itself, were false or materially misleading. *Id.* ¶¶ 54–57.

Both Chainalysis and the Celsius Insiders benefited from this alleged scheme. Chainalysis' backing of the purported audit gave the Press Release and the inflated AUM figure the credibility needed for the Insiders' scheme to succeed. *Id.* ¶¶ 50, 53, 57, 60. The Press Release, in turn, lent Chainalysis market credibility by highlighting its partnership with Celsius, a then-prominent crypto lending platform, positioning Chainalysis as a go-to industry partner for blockchain services. *Id.* ¶ 53.

**D. Celsius' CEL Bubble Bursts**

Customers "flocked to Celsius" to purchase CEL following the Press Release: in the six months following its publication, CEL's price soared from $2.21 to over $8 per token. Compl. ¶¶ 61, 68. Meanwhile, Chainalysis expressed awareness that the Press Release was misleading and "raised a lot of questions that we needed to answer," but never attempted to correct any misstatements publicly, even as Celsius issued three additional press releases relying on Chainalysis' methodology. *Id.* ¶¶ 62–67.

As a result of the surge in demand, Celsius was required to dedicate more resources to paying the CEL "rewards" owed through its loyalty program, even though the tokens were practically worthless in reality. *See id.* ¶ 69. While the Insiders sold their personal CEL back to the company to enrich themselves, Celsius buckled under the weight of their liabilities and filed

for bankruptcy in July 2022, around a year before Mashinsky was indicted for offenses related to the fraudulent scheme. *Id.* ¶¶ 70–76.

## II. PROCEDURAL HISTORY

As part of Celsius' Chapter 11 Bankruptcy Plan, the Bankruptcy Court appointed an entity called Blockchain Recovery Investment Consortium LLC ("BRIC") as a Complex Asset Recovery Manager and Litigation Administrator, in part to bring claims on behalf of the company. The present suit, brought on behalf of Celsius in Count One and certain Celsius customers who assigned their claims in Counts Two through Sixteen, was originally filed as an adversary proceeding in the bankruptcy court. Chainalysis moved to withdraw the reference, Dkt. No. 1, and the parties eventually stipulated to that relief, Dkt. No. 11. Count One alleges that Chainalysis aided and abetted the Insiders' breach of the fiduciary duty they owed to Celsius. Compl. ¶¶ 4–5, 80–89. Counts Two through Sixteen allege violations of various state consumer protection and business fraud statutes, as a purported assignee of Celsius customers who purchased CEL tokens after the Press Release was published. *Id.* ¶¶ 10, 90–250.

Chainalysis moved to dismiss the Complaint in its entirety for failure to state a claim. Dkt. No. 23. The Motion is now fully briefed and before the Court for decision. Dkt. Nos. 26–27.

## DISCUSSION

Chainalysis argues that the aiding and abetting claim in Count One should be dismissed for failure to plead knowing participation and because it is barred by the *in pari delicto* doctrine and the corollary *Wagoner* Rule. Mot. at 9–11. Neither argument provides a basis for dismissal at this stage of the litigation.

As to the state consumer claims, Chainalysis likewise argues that they are inadequately pled and are otherwise either time-barred, unassignable, lack required in-state conduct, or fail on other procedural grounds. *Id.* at 13–26. The Court agrees that Counts Two, Three, Four, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Fourteen, and Fifteen warrant dismissal as a matter of law, but finds that Counts Five, Thirteen, and Sixteen should be dismissed without prejudice and with leave to amend.

## I. LEGAL STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[2] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. The Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."). However, the Court need not accept conclusory assertions. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021).

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

## II. COUNT ONE IS ADEQUATELY PLED AND IS NOT BARRED BY THE *IN PARI DELICTO* DOCTRINE

### A. Count One is Adequately Pled

To state a claim for aiding and abetting a breach of fiduciary duty a plaintiff must allege: "(1) a breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damage as a result of the breach." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009). Chainalysis argues that Celsius fails to plead knowing participation and that, therefore, Count One must be dismissed. The Court disagrees.

"[A] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006). Additionally, "aiding and abetting liability arises only when plaintiffs' injury was 'a direct or reasonably foreseeable result' of the complained-of conduct." *Kottler*, 607 F. Supp. 2d at 466. The Complaint adequately alleges that Chainalysis knew the Press Release contained false statements, including the AUM, and actively participated in disseminating those falsehoods. The allegations make out much more than idly allowing the fraud. The Complaint alleges, for example:

- "[T]he statement from Bonds, Chainalysis's CRO, knowingly and intentionally misled the public by concealing that the amount of 'withdrawals' was offset by Celsius's CEL holdings and other assets." Compl. ¶ 50.
- "Not only was Chainalysis prominently featured in the Press Release, but it had also played a direct role in drafting it." *Id.* ¶ 51.
- "Chainalysis knew that the stated AUM was materially false" and "knew that the statement in the Press Release attributed to its Chief Revenue Officer . . . was materially false, in that it understated the amount of withdrawals actually calculated by Reactor." *Id.* ¶¶ 54–55.

- "Chainalysis knew that the process involved more than a simple counting of 'total deposits and total withdrawals.'" *Id.* ¶ 56.
- Chainalysis knew the "Press Release was materially misleading, particularly in falsely suggesting that there had been an 'audit,' 'independent verification,' and 'third-party verification' of the stated AUM." Although there had been no audit, "Chainalysis approved the use of the term 'audit' five times in the Press Release." *Id.* ¶¶ 57–58.

These allegations are more than conclusory and properly allege the requisite knowledge and substantial assistance to survive a motion to dismiss.

**B. The *In Pari Delicto* Doctrine and *Wagoner* Rule Do Not Bar Count One.**

Chainalysis next argues that Count One should be dismissed because it is barred by the *in pari delicto* doctrine and the related *Wagoner* Rule, Mot. at 9–10, which prevent "a wrongdoer" from "profit[ing] from [its] own misconduct," *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010).[3] They argue that Plaintiffs stand in the shoes of pre-bankruptcy Celsius, which caused and benefited from the wrongdoing at issue, and that, therefore, Plaintiffs should be barred from recovery. Mot. at 9–10.

Plaintiffs respond that the "adverse interest exception" to the *in pari delicto* doctrine applies to its claim because the Insiders acted "solely for their own personal gain and in conflict with the corporation's interests." Opp. at 13. Specifically, Plaintiffs highlight their allegations that Celsius was the *victim* of the Insiders' "scheme to enrich themselves" to Celsius' detriment, rather than an active participant in the wrongful conduct. Opp. at 13. Plaintiffs further liken the Insider's conduct to "looting" sufficient to trigger the adverse interest exception. Opp. at 14; Compl. ¶ 72.

---

[3] Though the *Wagoner* Rule and *in pari delicto* doctrine are legally distinct principles, they are corollaries, and the Court will evaluate them together.

Because it is an affirmative defense, courts may properly determine the applicability of *in pari delicto* on a motion to dismiss—but only "when issues of imputation are clearly established by the allegations on the face of the complaint." *VeroBlue Farms USA Inc. v. Canaccord Genuity LLC*, No. 20-CV-4394 (JPC), 2021 WL 3913555, at *12 (S.D.N.Y. Sept. 1, 2021) (quoting *Buckley v. Deloitte & Touche USA LLP*, No. 06-CV-3291 (SHS), 2007 WL 1491403, at *5 (S.D.N.Y. May 22, 2007)). This is not one of those cases.

To be clear, Defendant's arguments on the merits are compelling: the adverse interest exception only applies when an agent, here the Insiders, has "totally abandoned his principal's [Celsius'] interests," and is "acting entirely for his own or another's purposes," and does not apply where there is benefit to both the employee and the corporation. *Kirschner*, 15 N.Y.3d at 466. The benefit is evaluated in the short term, and "any detriment to the corporation resulting from the unmasking of the [wrongful act]" is not properly considered. *Id.* at 460. Defendant makes a strong case that Celsius, at least in the short-term, benefited from the Insider's actions in that their CEL tokens were sold at an inflated value, increasing the Company's reputational value and boosting their customer numbers and other business metrics.

That said, at this stage, the Court cannot ignore—and must accept as true—Plaintiff's allegations that the Insiders acted entirely for their own benefit. *Compare Buckley*, 2007 WL 1491403, at *1 (allowing a trustee's claim to proceed despite indications in the complaint that the company shared blame for the harms it attributed to its auditors), *with Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 548 (S.D.N.Y. 2013) (reaching the opposite outcome where no allegations in Complaint that entity's agent's actions "were taken for the exclusive benefit of the agent"). For example, the Complaint alleges:

- "Chainalysis substantially assisted the Insiders' scheme to lie to the public and their own company about Celsius's AUM, which was the

fuel needed to fraudulently grow Celsius's customer base, creating demand for the CEL token so Insiders could offload their CEL tokens to Celsius and the customer base at a bloated price." Compl. ¶ 53;

- "As more customers flocked to Celsius and the price of CEL soared post-Press Release, Celsius was required to spend more dollars each week to pay the CEL 'rewards' owed to customers, which ultimately resulted in the demise of Celsius and the enrichment of the Insiders." *Id.* ¶ 69;

- "To enrich themselves, the Insiders sold their personal CEL directly back to Celsius via the Company's OTC trading desk." *Id.* ¶ 70;

- "Celsius was buying the same CEL that the Insiders were selling in a directly adversarial process where the Insiders sold CEL at a profit and Celsius bought that CEL at a loss. The self-dealing by the Insiders amounts to looting. The Insiders undertook those actions solely for their personal benefit, thereby resulting in harm to Celsius." *Id.* ¶ 72.

Thus, solely on the face of the pleadings, the Court will not impute the Insiders' improper conduct to Celsius so as to bar Plaintiff's claim in Count One from proceeding.

## III. COUNTS 4, 6, 7, 9, 10, 11, AND 15 ARE DISMISSED

Counts Four (New Jersey Consumer Fraud Act), Six (California Unfair Competition Law), Seven (California False Advertising Law), Nine (Texas Deceptive Trade Practices Act), Ten (Virginia Consumer Protection Act), and Fifteen (North Carolina Unfair Deceptive Acts and Practices Act) are dismissed on consent because, as Plaintiffs acknowledge, they are unassignable state consumer protection claims. Opp. at 27 n.9.

As to Count Eleven (Indiana Deceptive Consumer Sales Act or "Indiana DCSA"), Defendant argues that the statute of limitations runs two years from the allegedly deceptive act and thus any claim based on the December 9, 2020 Press Release must have been filed by December 9, 2022. Mot. at 22. As Plaintiffs did not attempt to refute Defendant's motion as to the Indiana DCSA in its Opposition, they have waived any right to oppose dismissal. *See, e.g.*, *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a

court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *In re UBS AG Secs. Litig.*, No. 07-CV-11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (recognizing that plaintiff "concedes through silence" arguments that it fails to address in its opposition brief); *AT&T Corp. v. Syniverse Tech., Inc.*, No. 12-CV-1812 (NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (finding that a party may concede an argument by failing to address it in an opposition brief).

Accordingly, Counts Four, Six, Seven, Nine, Ten, Eleven, and Fifteen are DISMISSED.

## IV. COUNT 12 IS DISMISSED AS NOT ASSIGNABLE

Chainalysis argues that Count Twelve (Colorado Consumer Protection Act or "Colorado CPA") is also not assignable in this instance. Mot. at 20. Celsius argues in opposition that the Colorado CPA ought to be construed liberally, and that it permits claims by "any successor in interest to an actual consumer who purchased the defendant's goods, services, or property." Opp. at 27 (citing Colo. Rev. Stat § 6-1-113(1)(b)). While the Court agrees with Plaintiffs that the phrase "any successor in interest" may suggest that Colorado CPA claims are assignable in some cases, that does not apply to this case. Indeed, Plaintiffs' excerpt belies its argument: subsection (b) requires purchase of the *defendant*'s goods, services, or property, and nowhere do Plaintiffs allege any would-be assignor purchased *Chainalysis'* goods, services, or property. *See U.S. Fax Law Center, Inc. v. Myron Corp.*, 159 P.3d 745, 747 (Colo. Ct. App. 2006) ("the only assignees authorized to bring an action are those whose assignors were actual consumers who purchased the defendant's goods, services, or property."); *U.S. Fax Law Center, Inc. v. iHire, Inc.*, 374 F. Supp. 2d 924, 930 (D. Colo. 2005), *aff'd U.S. Fax Law Center, Inc. v. iHire, Inc.*,

476 F.3d 1112, 1120 n.7 (10th Cir. 2007). Because the Colorado CPA claim is unassignable under the facts of this case, Count Twelve must be dismissed.

## V. COUNTS 2 AND 3 ARE DISMISSED AS TIME-BARRED; COUNT 16 REMAINS

Next, Defendant argues that Count Two (New York Deceptive Practices Act, General Business Law § 349) ("GBL § 349") and Count Three (New York False Advertising Law, General Business Law § 350) ("GBL § 350") should be dismissed as time-barred. The parties agree that the New York claims "accrue when the injury occurs" and that the limitations period is three years. Mot. at 22; Opp. at 29; Reply at 9. The parties disagree, however, about what the relevant injury is.

Chainalysis asserts that any injury under GBL § 349 occurred on the date of the alleged misrepresentations—the December 9, 2020, Press Release—and that any injury under GBL § 350 must have been realized within six months of Press Release as the outer bound of any resulting CEL token purchases, as pled. Mot. at 22. Celsius argues in opposition that the injury "was not limited to a single moment"—that, instead, injuries continued to flow from additional releases that incorporated the same alleged misrepresentations as the Press Release. Opp. at 29. Therefore, Celsius proposes, "rolling injuries" were sustained as late as 2022.

Plaintiffs misconstrue Celsius' announcements on January 30, March 10, and August 24 of 2021, which used the same Chainalysis-approved methodology that was prepared for the December 9, 2020 Press Release, as acts performed by Chainalysis. Opp. at 29. But the Complaint does not sufficiently allege that the additional publications were acts done by Chainalysis, or with Chainalysis' knowing participation, and thus the "rolling injuries" theory lacks support sufficient for a claim against Chainalysis. *See Martin v. Meredith*, 657 F.Supp.3d 277, 287 (S.D.N.Y. 2023) (third-party actions are not sufficient to show that "defendants engage

in any materially misleading conduct."). Because Plaintiffs have not made allegations that can support injury under these statutes beyond the date of the Press Release and subsequent traceable purchases of CEL, Counts Two and Three must be dismissed as time-barred.[4]

Defendant also moves to dismiss Count Sixteen as time-barred. The Court declines to do so. While the Arizona CFA has a one-year statute of limitations, it begins to run when "the consumer knows whose products were involved and that the products were not performing as expected." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 826 (D. Ariz. 2016). The date when this discovery occurred, so as to begin the running of the statute of limitations, is a question of fact. *Id*. A claim can only be dismissed as untimely if the "running of the statute of limitations is apparent on the face of the complaint." *Id*. Because nothing on the face of the complaint indicates that Plaintiffs undoubtedly knew, or with reasonable diligence should have known, of the Chainalysis' involvement within one year of the date they filed the complaint, Count Sixteen cannot be dismissed at this stage.[5]

---

[4] Plaintiffs also invoke the "continuing wrong" doctrine, which "is usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act." *Butry v. Nat'l Collegiate Student Loans Class Action Complaint Tr. 2005-3*, No. 20-CV-5843 (PGG), 2025 WL 2720622, at * 5 (S.D.N.Y. Sept. 24, 2025). This doctrine applies to GBL § 349 claims "where that claim is based on a series of allegedly deceptive acts" but "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct. The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs." *Id*. at *6. Plaintiffs' allegations that there were rolling injuries because customers continued to purchase and receive CEL and join and stay in programs through 2021 into 2022, which extend the accrual of claims into late 2024 or 2025, is unpersuasive because they are continuing effects of prior unlawful conduct, rather than injuries from an independent wrong or from a series of continuing wrongful acts.

[5] Count 8 also challenged as time-barred but is separately dismissed, *infra* § VI.

## VI. COUNT 8 IS DISMISSED BECAUSE THE CALIFORNIA CLRA APPLIES ONLY TO TANGIBLE GOODS

Defendant next argues that Count Eight (California Consumers Legal Remedies Act or "California CLRA") should be dismissed because the California CLRA covers only statements about tangible goods and services, and not cryptocurrency or services involving cryptocurrency, citing *Pearl v. Coinbase Glob., Inc.*, No. 24-CV-2153, 2024 WL 3416506, at *5 (N.D. Cal. July 15, 2024) for support. Mot. at 24–25.

Plaintiffs, in a footnote, interpret *Pearl* as holding that California CLRA claims fail only where a transaction at issue does not involve a covered "good" or "service," and not simply any time cryptocurrency is involved. Opp. at 32 n.11. Plaintiffs continue that the claims here arise from "consumer-facing financial services," including "interest-bearing accounts, custodial services, and crypto-backed loans" and are therefore covered by the CLRA. *Id.* In Reply, Defendant contends that 1) the "consumer-facing financial services" cited by Plaintiffs are "ancillary services" not covered by the CLRA; and 2) the Press Release does not constitute a "service" under the CLRA. Reply at 11.

The Court agrees with Defendant that the services cited by Plaintiffs are "ancillary" and that ancillary services are not covered by the California CLRA. For services in connection with sales of goods to qualify under the California CLRA the goods "themselves must be covered by the CLRA." *Suski v. Marden-Kane, Inc.*, No. 21-CV-04539 (SK), 2022 WL 3974259 at *8 (N.D. Cal. Aug. 31, 2022). The consumer-facing financial services alleged by Plaintiffs to be covered by the CLRA are inclusive of "interest-bearing accounts, custodial services, and crypto-backed loans:" services offered by an entity that sells cryptocurrency. Opp. at 32 n.11; *See Suski*, 2022 WL 3974259, at *8 (finding that if "services were offered by an entity which sold cryptocurrency, such services would be considered ancillary and would not be covered by the

CLRA."); *Meyer v. Cap. All. Grp.*, No. 15-CV-2405 (WVG), 2017 WL 5138316, at *6 (S.D. Cal. Nov. 6, 2017) (rejecting argument that plaintiffs' services were not covered by the CLRA because they were not lenders themselves and merely served as loan advertisers). Indeed, "bootstrapping the CLRA" in the manner suggested by Plaintiffs would "defeat the apparent legislative intent in limiting the definition of goods and services by greatly expanding that definition." *Meyer*, 2017 WL 5138316, at *8 (cleaned up). Accordingly, Count Eight is dismissed.

## VII. COUNT 14 IS DISMISSED FOR FAILURE TO SATISFY THE STATUTE'S TERRITORIAL REQUIREMENTS, BUT COUNTS 5 AND 16 MEET THIS REQUIREMENT

Chainalysis next seeks to dismiss Count Five (Florida Deceptive and Unfair Trade Practices Act or "Florida DUTPA"), Count Fourteen (Massachusetts Consumer Protection Act or "Massachusetts CPA"), and Count Sixteen (Arizona Consumer Fraud Act or "Arizona CFA") because, it argues, those claims require sufficient in-state conduct not satisfied here. The Court agrees as to the Massachusetts CPA claim in Count Fourteen, but disagrees as to the Florida DUTPA and Arizona CFA claims in Counts Five and Sixteen.

The Florida DUTPA and the Arizona CFA are both aimed at curbing deceptive practices that have transpired within the state and, accordingly, such claims must arise from improper conduct that occurred in-state. *See, e.g.*, *McCabe v. Ford Motor Co.*, 774 F. Supp. 3d 349, 398 (D. Mass. 2025) (the Florida DUTPA "seeks to prohibit . . . practices which have transpired within the territorial bounds of" Florida (quoting *Millenium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So.2d 1256, 1262 (Fla. Dist. Ct. App. 2000))); *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012) (the "FDUTPA applies only to actions that occurred within the state of Florida."); *State ex. rel.*

*Corbin v. Goodrich*, 151 Ariz. 118, 124 (App. 1986) (the Arizona CFA "applies to acts committed within Arizona").

At the motion to dismiss stage, however, this is a low bar: neither state requires that the wrongful conduct occur exclusively or substantially in the state—only that "at least some improper acts occurred" in-state. *Toretto v. Donnelly Financial Solutions, Inc.*, 583 F. Supp. 3d 570, 606 (S.D.N.Y. 2022) (citing *Eli Lilly & Co. v. Tyco Integrated Sec., LLC*, No. 13-CV-80371, 2015 WL 11251732, at *4 (S.D. Fla. Feb. 10, 2015)); *see also Vanguard Specialized Funds v. VEREIT Inc.*, No. CV-15-02157 (PHX) (ROS), 2016 WL 5858735, at *10 (D. Ariz. Oct. 3, 2016) (finding that the Arizona CFA is not limited "only to acts committed *entirely* within Arizona") (emphasis in original).

Celsius alleges that Chainalysis "played a direct role in drafting" the Press Release, including by providing line edits on a draft, which were ultimately accepted by Mashinsky, and approving the final product for publication. Compl. ¶ 51. Resolving all inferences in Plaintiffs' favor, these allegations make a strong enough showing that Chainalysis sufficiently engaged in the publication process—understanding that the Press Release would be published online and thus disseminated in every state—as to constitute in-state conduct for the purposes of these consumer protection statutes. In conjunction with the state-specific allegations that consumers in each state were injured because of the publication of that allegedly false information, the allegations, accepted as true, are sufficient to satisfy the geographical requirements of the Florida DUTPA and Arizona CFA at the pleading stage. *See Feiner v. Innovation Ventures LLC*, No. 12-CV-62495, 2013 WL 2386656, at *2–*4 (S.D. Fla. May 30, 2013); *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, 955 F. Supp. 2d 1311, 1322–27, 1331–33 (S.D. Fla. 2013).

The Massachusetts CPA, however, requires more than simply some in-state conduct: it requires that "the center of gravity of the circumstances that give rise to the claim" are "primarily and substantially" within the state. *Sonoran Scanners, Inc. v. Perkinelmer, Inc.*, 585 F.3d 535, 546 (1st Cir. 2009) (quoting *Kuwaiti Danish Comput. Corp. v. Digit. Equip. Co.*, 438 Mass. 459, 781 N.E.2d 787, 799 (2003)). Although this may be a fact-intensive analysis, "courts will grant a motion to dismiss when the complaint fails to plead facts demonstrating that the center of the alleged misconduct was within Massachusetts." *LendingClub Bank, Nat'l Assoc. v. Valley Nat'l Bank*, 828 F. Supp. 3d 162, 197 (D. Mass. 2026).

As set forth above, the Complaint alleges *some* modicum of in-state conduct through the knowing distribution of the Press Release into the state. But Massachusetts cannot be the state from which the claims "primarily and substantially arose" because the alleged misrepresentations were admittedly made "nationwide" and the core wrongful conduct occurred in New York. Opp. at 30; Compl. ¶¶ 94–95. *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012) (finding that the center-of-gravity test is not satisfied "[w]here wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country"); *Garshman Co. v. Gen. Elec.*, 176 F.3d 1, 6–7 (1st Cir. 1999) (conduct did not occur "primarily and substantially in Massachusetts" under the consumer protection statute where the plaintiff lived in Massachusetts and was injured there, but most of the defendants' conduct occurred out of state). Accordingly, because Plaintiffs have not adequately pled that Chainalysis' misconduct occurred "primarily and substantially" within Massachusetts, Count Fourteen must be dismissed.[6]

---

[6] The Court is aware that some Massachusetts courts have declined to dismiss claims where the complaint alleges only that a plaintiff is located in Massachusetts and that the injury occurred in Massachusetts. *See, e.g.*, *Jofran Sales, Inc. v. Watkins & Shepard Trucking, Inc.*, 216 F. Supp. 3d 206, 216 (D. Mass. 2016); *Guest-Tek Interactive Ent. Inc. v. Pullen*, 731 F. Supp. 2d 80, 92 (D. Mass. 2010); *Nasuni Corp. v. ownCloud GmbH*, 607 F. Supp. 3d 82, 99 (D. Mass. 2022). However, "[a] bare allegation that a party is located in Massachusetts and was injured [t]here . . . absent 'specific factual

## VIII. COUNTS 5, 13, AND 16 ARE ADEQUATELY PLED, BUT PLAINTIFFS MUST IDENTIFY PARTICULAR CONSUMERS WHO ASSIGNED CLAIMS AND SUFFERED HARM

Finally, Chainalysis seeks to dismiss the surviving claims—Counts Five ("Florida DUTPA"), Thirteen ("Washington CPA"), and Sixteen ("Arizona CFA")—for failure to plead necessary elements of the claim and failure to plead customers who relied on the press release. The elements of each claim are adequately pled because the Complaint alleges that (1) Chainalysis knowingly misrepresented and intentionally concealed material facts involving Celsius' AUM and related procedures, Compl. ¶ 131 (Florida), ¶¶ 209–11 (Washington), ¶ 244 (Arizona); (2) that those misrepresentations were likely to, and did, mislead consumers in the respective states, *id.* ¶ 211 (Washington); (3) those representations occurred in connection with the sale of CEL tokens and affected the public interest, *id.* ¶¶ 56, 60, 83, 210–11 (Washington), ¶ 246 (Arizona); (4) that the buyers in the respective states would not have purchased the CEL had they known the truth, *id.* ¶ 133 (Florida), ¶ 211 (Washington), ¶ 246 (Arizona); and (5) they suffered harm as a result, *id.* ¶¶ 136–37 (Florida), ¶ 214 (Washington), ¶ 249 (Arizona). *See Panag v. Farmers Ins. Co. of Washington*, 166 Wash. 2d 27, 204 P.3d 885, 889 (2009) (the elements of a Washington CPA claim are: (1) an unfair or deceptive act of practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation); *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012) (the elements of a Florida DUTPA claim are: (1) a deceptive act of unfair practice; (2) causation; and (3) actual damages); *Lorona v. Arizona Summit L. Sch., LLC*, 188 F.Supp.3d

---

allegations' supporting that claim, is insufficient and warrants dismissal." *CrunchTime! Info. Sys., Inc. v. Frischs Rests., Inc.*, 768 F. Supp. 3d 183, 186 (D. Mass. 2025). The Court finds that the claims here fall in the latter bucket; the Complaint provides no specificity around its state consumer protection allegations—indeed, as explained below, the Complaint fails to identify any consumer actually injured.

927, 933 (D. Ariz. 2016) (the elements of an Arizona CFA claim are (1) a false promise or misrepresentation; (2) in connection with the sale or advertisement of merchandise; (3) a plaintiff relief on the misrepresentation; and (4) a plaintiff was harmed as a result).

The Court agrees, however, that the Complaint must identify particular consumers in the relevant states who validly assigned their claims to Plaintiff, and also allege that those same consumers suffered the alleged harm. Accordingly, Counts Five, Thirteen, and Sixteen are dismissed without prejudice and with leave to amend consistent with this Opinion.

**CONCLUSION**

For the reasons set forth above, the motion to dismiss as to Counts Two, Three, Four, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Fourteen and Fifteen is GRANTED, and those claims are dismissed as a matter of law, with prejudice. Counts Five, Thirteen, and Sixteen are dismissed without prejudice and with leave to amend. The motion as to Count One is DENIED.

If Plaintiffs choose to amend the Complaint to properly plead Counts Five, Thirteen, and Sixteen, they shall do so by no later than October 20, 2026. If they choose not to amend, they shall file a letter so informing the Court by the same date.

Dated: September 29, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge